# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>CRAIG ESSING,<br><br>　　　　Defendant. | Case No.　17-CR-3047-LTS<br><br>**REPORT AND RECOMMENDATION** |

This matter is before the court on Defendant Craig Essing's motion to suppress (Doc. 56). Essing seeks to suppress evidence seized and statements made during the execution of a search warrant at his residence. Essing requests a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), arguing that the affiant intentionally or with reckless disregard for the truth made material omissions from and a misrepresentation in the search warrant affidavit. In addition, Essing argues that the information in the affidavit does not establish probable cause, that it was based primarily on unreliable information from informants who were not credible, and that some of the informant information was stale. The United States (the Government) filed a written resistance (Doc. 57), asserting that Essing is not entitled to a *Franks* hearing, that the warrant is supported by probable cause, and that if not, agents relied in good faith on the warrant. I conducted a hearing on the motion on July 18, 2018 (Doc. 64), and the following exhibits were offered and received without objection: Exhibit 1, application, affidavit, and search warrant; Exhibit 2, report of search warrant execution; Exhibit 3, photograph of Craig Essing; Exhibit 4, photograph of Craig Essing's driver's license; Exhibit 5, detention hearing transcript; Exhibit A, report from meeting on September 6, 2017; and Exhibit B, report from surveillance on August 31, 2017 (Docs. 60, 62, 63). The Government also offered

the testimony of Special Agent Eric Young with the Iowa Division of Narcotics Enforcement (DNE). For the reasons stated below, I recommend **denying** the motion to suppress.

## I. RELEVANT FACTS[1]

On September 7, 2017, Special Agent Bryant Strouse with DNE submitted an application and affidavit for a state warrant to search Essing's person, white Ford Ranger pickup, and residence located in Fort Dodge, Iowa. Ex. 1.[2] The same date, an Iowa district judge in Webster County issued the requested warrant, authorizing the search for evidence of drug-trafficking activities. Ex. 1. The affidavit submitted in support of the warrant outlined Agent Strouse's training and experience, included information about common drug-trafficking methods, and summarized the investigation of Essing's alleged involvement in distributing methamphetamine. *Id*. The affidavit included the following information about this investigation:

- During a debriefing in July 2015, federal defendant A.R.[3] provided information about supplying "Craig Essing" with methamphetamine during the summer of 2015. A.R. said that "Essing goes by the nickname 'Pops'" and indicated that these drug transactions occurred at Essing's residence (the affidavit does not indicate where that residence is located).

---

[1] The information in this section comes from testimony provided at the suppression hearing and the exhibits.

[2] "Ex." refers to the exhibits submitted by the parties (Docs. 60, 62, 63).

[3] The individuals identified by initials in this report and recommendation were named in the search warrant affidavit, which is filed under seal (Doc. 60).

2

- o Agent Strouse was aware that Essing has resided at his current residence (identified in the application as the residence to be searched in Fort Dodge) since before 2015. Ex. 1 at 10.
- Special Agent Matt Anderson with DNE provided information about the November 2016 arrest of M.L.A. in Des Moines, Iowa. M.L.A. was in possession of $100,000 in United States currency and a stolen firearm. M.L.A. described his prior distribution of methamphetamine to and collection of United States currency from two people in Fort Dodge—one an "unidentified older white male [who] lived on the South side of Fort Dodge and worked in a hospital setting as some type of therapist." M.L.A. stated this older white male received 30-pound quantities of methamphetamine and stored the methamphetamine in a tire or washing machine.
    - o Agents verified that Essing previously worked as a nurse and that his residence is on the south side of Fort Dodge. Ex. 1 at 9.
- In August 2017, Special Agent Eric Studer with DNE received information from a confidential source (CS#1) about the receipt of multiple pounds of methamphetamine in the Des Moines area and cash deposits made into bank accounts to pay for the methamphetamine. CS#1 identified M.D. as a person who made cash deposits into these bank accounts. Ex. 1 at 8.
- On August 31, 2017, Agent Studer relayed information from CS#1 that M.D. was en route to Fort Dodge from the Des Moines area to collect money.
    - o Agents conducting surveillance saw M.D. driving a vehicle registered to M.D.
    - o Agent Strouse saw M.D. arrive at a restaurant in Fort Dodge at around 9:45 p.m. and "meet with a white Ford Ranger" registered to Essing. Agent Strouse "observed [M.D.] lean inside Essing's truck and

3

appeared to conduct some sort of transaction," although Agent Strouse "was unable to exactly determine what was exchanged."

- o Agent Strouse described the driver of the white Ford Ranger as "an older white male with longer shaggy type hair . . . similar in appearance to Essing," although Agent Strouse "was not able to definitively identify Essing as the driver."
- o The white Ford Ranger left the restaurant approximately ten minutes later and Agent Strouse "observed the Ford Ranger drive in a manner consistent with conducting counter-surveillance [by] circling the block and driving slowly." Agent Strouse followed the white Ford Ranger to Essing's neighborhood but discontinued surveillance at that time "due to the observations of counter-surveillance."
- o Agent Strouse saw the white Ford Ranger parked at Essing's residence the next morning (September 1, 2017) and has seen it parked there "on numerous occasions since." Ex. 1 at 10.
- Agent Studer met with CS#1 on September 6, 2017, and CS#1 relayed that M.D. told CS#1 that M.D. "recently delivered nine (9) pounds of methamphetamine to 'the old man' in Fort Dodge." CS#1 also said that M.D. "collected $103,000 from 'the old man' in Fort Dodge and delivered nine (9) grams of heroin to 'the old man.'"
  - o Agent Strouse knows that Essing goes by the nickname "Pops" and believed, based on his observations and information known about Essing, that Essing was "the old man" that M.D. discussed with CS#1. Ex. 1 at 11.
- Agent Strouse outlined methods he knows to be used by drug traffickers based on his training and experience. Ex. 1 at 3-8.

Agent Strouse included an "Informant Attachment" for CS#1, indicating that CS#1:

- is a concerned citizen known to Agent Studer for five months;
- is a mature individual;
- is a person of truthful reputation;
- has otherwise demonstrated truthfulness;
- has provided information at least 100 times that has led to:
    - five search warrants,
    - multiple arrests,
    - numerous drug-related charges, and
    - the seizure of stolen property, drugs, or other contraband;
- has not given false information in the past; and
- provided information during the current investigation that law enforcement corroborated.

Ex. 1 at 12. Agent Strouse also included information from the Webster County Assessor about Essing's residence. Ex. 1 at 20-22.

In endorsing the search warrant application, the judge handwrote "see affidavit attached" and "[p]ersonal observation of 'drop' which was supported by other information" under the "Abstract of Testimony" section. Ex. 1 at 13. The judge marked that he relied in part on the information from an informant (CS#1), that the informant had given reliable information on previous occasions, and that the judge found the informant's information reliable because "[i]nformation reliable historically [and] supported by other independent evidence." *Id.*

Officers executed the warrant on September 8, 2017. Agents seized several items from Essing's person, the residence, and detached garage, including: suspected methamphetamine, United States currency, firearms, ammunition, digital scales, and packaging material with suspected drug residue. Special Agent Young participated in the execution of the search warrant and identified Essing during the suppression hearing

5

(whose features match the general description of an older male with white, shaggy hair, *see* Ex. 3). Agent Young had reviewed the search warrant and testified he believed the warrant was supported by probable cause. He was not aware of Agent Strouse acting in bad faith in seeking or executing the search warrant.

Agent Young testified about law enforcement practices and his knowledge of general drug-trafficking methods, to include the following:

- *Recordings by informants:* Although informants are often given recording equipment, that equipment does not always work.
- *Surveillance:* Agents conduct surveillance to try and observe what is happening and yet work to avoid being seen by the people under surveillance. Agents use their own eyes, binoculars, and electronic equipment (such as tracking devices) to conduct surveillance and can effectively conduct surveillance at night.
- *Quantities of methamphetamine:* Distribution quantities of methamphetamine vary and could include one-sixteenth (1/16) of an ounce, commonly known as a "teener," and would definitely include quantities of at least one-eighth (1/8) ounce, commonly known as an "eight-ball."
- *Indicia of distribution:* Common indicia of drug distribution include large sums of United States currency, large quantities of drugs, packaging materials, surveillance equipment, firearms, drug ledgers, and electronic devices.
- *Storage of drugs:* Drug distributors often store drugs at locations where they can be safe-guarded from theft. Distributors often use firearms to protect drugs and United States currency.
- *Counter-surveillance techniques:* Persons involved in drug distribution may use counter-surveillance to determine whether they are being followed by law

enforcement (to avoid detection) or by competitors or others (to avoid theft of drugs or United States currency).

- *Travel:* It is not uncommon for drug distributors to make stops when they take longer trips related to drug distribution.
- *Distribution:* It would be unusual for a person to be able to redistribute a quantity of nine pounds of methamphetamine in one week, and Agent Young would have a high expectation that at least a portion of the nine pounds would still be present one week after it was received for distribution. Although grams can be redistributed quickly, it often takes much longer to redistribute pound-quantities of methamphetamine.
- *Retaining evidence of distribution*: Drug distributors often retain evidence of distribution (such as drug ledgers, packaging material, surveillance equipment, and United States currency) for longer periods of time after the actual drugs have been sold.

Agent Young acknowledged a report by Agent Studer about the surveillance conducted August 31, 2017 (M.D.'s trip to Fort Dodge from the Des Moines area) (Ex. B), that listed the following stops made by M.D. after beginning the trip to Fort Dodge:

- 12-minute stop at Dollar General in Des Moines (observed via tracking device surveillance);
- 1-minute stop, parked in an alleyway between residences in Des Moines (observed via tracking device surveillance);
- 14-minute stop at a Quick Trip gas station in Des Moines (observed via tracking device surveillance and visual surveillance by Agent Studer);
- 9-minute stop at a rest area on northbound Interstate 35 (observed via tracking device surveillance and visual surveillance by Agent Studer); and

7

- M.D. entered the restaurant after meeting with the person in Essing's white pickup in the parking lot.

Ex. B at 2-3. The tracking device surveillance report reflected Agent Strouse's observations that were included in the affidavit:

- M.D. arriving at the restaurant parking lot and "meeting with a white male at the driver side of a white Ford Pickup truck [registered to Essing,] . . . leaning inside the window" of the pickup a few minutes after arriving; and
- the pickup leaving the parking lot "driv[ing] in a manner consistent with conducting counter surveillance" that included "numerous turns that amounted to driving in circles."

*Id.* at 3. Approximately twenty-five minutes after Essing left the parking lot, Agents Studer and Strouse saw M.D. walk out of the restaurant to M.D.'s car and drive away. *Id*. According to tracking device surveillance, M.D. then traveled directly back to the same Quick Trip in Des Moines. *Id*.

Agent Young also acknowledged that another report by Agent Studer (Ex. A) shows that agents provided CS#1 with a recording device prior to the September 6, 2017, meeting with M.D. (during which CS#1 said M.D. talked about delivering methamphetamine and heroin to and collecting United States currency from "the old man" in Fort Dodge). The report does not state that agents overheard M.D. make these statements reported by CS#1. The report indicates that CS#1 told agents the purported statements by M.D. when agents debriefed CS#1 after the meeting. *See* Ex. A.

Agent Young testified he was the case agent in A.R.'s federal drug case and was aware of the information A.R. provided related to the Essing investigation. Specifically, A.R. identified "Craig" (not "Craig Essing") as a methamphetamine distributor who lived near the "Flats" of Fort Dodge and went by the nickname "Pops." A.R. never identified Essing by photograph, but Agent Young was aware from other informants and

8

general word on the street that Essing goes by the nickname "Pops." Agent Young was also aware that Essing lived near the Flats, which is a neighborhood on the south side of Fort Dodge. Agent Young was not aware of any other persons known as "Craig" or "Pops" who lived near the Flats. Agent Young believed A.R.'s information was credible. Although A.R. had delivered methamphetamine to Essing in 2015, Agent Young believed it would not be uncommon for Essing to still possess drug ledgers or similar items related to drug transactions with A.R. from 2015.

## II. DISCUSSION

### A. *Legal Framework*

The Fourth Amendment provides that a warrant to search persons or places must be supported by probable cause. *United States v. Williams*, 477 F.3d 554, 557 (8th Cir. 2007). Probable cause is based upon "a practical, common-sense decision" of whether the totality of circumstances show "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id*. A search warrant may be invalid if an affiant either includes false statements in the affidavit; or omits material facts from the affidavit. *Id*. The defendant must show, by a preponderance of evidence, that (1) the affiant acted intentionally or with reckless disregard in making the false statement or material omissions, and (2) the affidavit would not support a finding of probable cause if the false statements were left out of, or the material omissions were included in the affidavit. *Id*.

To be entitled to a *Franks* hearing, "a defendant must make a substantial preliminary showing that includes 'allegations of deliberate falsehood or of reckless disregard for the truth,'" *id*. (quoting *Franks v. Delaware*, 438 U.S. 154, 171 (1978)), and that if the false statements were removed or the omitted statements were included, the affidavit would not support a finding of probable cause. *United States v. Arnold*, 725 F.3d 896, 898 (8th Cir. 2013). "This substantiality requirement is not met lightly

9

and requires a defendant to offer specific allegations along with supporting affidavits or similarly reliable statements." *United States v. Gonzalez*, 781 F.3d 422, 430 (8th Cir. 2015). This requirement is based on "a presumption of validity with respect to the affidavit supporting the search warrant." *Williams*, 477 F.3d at 558. "Because a warrant application need only show facts establishing probable cause, reckless disregard for the truth may be inferred from the omission of information from an affidavit only when the material omitted would have been clearly critical to the finding of probable cause." *United States v. Carnahan*, 684 F.3d 732, 735 (8th Cir. 2012) (cleaned up). Put another way, the defendant must show that probable cause would not have existed if the omitted information had been included in the affidavit. *See Gonzalez*, 781 F.3d at 731. If the affidavit would still provide probable cause to issue a search warrant, the defendant fails to make the necessary preliminary showing for a *Franks* hearing. *Id.*

Even if the affidavit did not contain probable cause, evidence obtained based on the search warrant need not be excluded when officers reasonably relied in good faith on the judge's issuance of the warrant. *See United States v. Carpenter*, 341 F.3d 666, 669 (8th Cir. 2003) (discussing the good faith exception outlined in *United States v. Leon*, 468 U.S. 897 (1984)). In determining the objective reasonableness of an officer's reliance on a warrant, a reviewing court looks at the totality of circumstances, including information known to officers but not presented to the judge who issued the warrant. *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015). The good faith exception to the exclusionary rule does not apply when (1) the issuing judge was misled by information the affiant intentionally or with reckless disregard for the truth included or omitted from the affidavit in support of the warrant, (2) the issuing judge "completely abandoned" the judge's role in issuing the warrant, (3) the affidavit is "so lacking in indicia of probable cause as to render [officers'] belief in its existence entirely unreasonable," or (4) "the warrant is 'so facially deficient' that no police officer could reasonably presume the warrant to be valid. *Id.* (quoting *Leon*, 468 U.S. at 923);

10

*Carpenter*, 341 F.3d at 669. Put another way, the issue is "whether a reasonably well trained officer would have known that the search was illegal despite a judge's issuance of the warrant." *Jackson*, 784 F.3d at 1231.

### B. Franks *Hearing*

Essing argues he is entitled to a *Franks* hearing on three grounds: (1) Agent Strouse omitted that M.D. made stops between Des Moines and Fort Dodge before arriving to the restaurant parking lot and that M.D. went into the restaurant after interacting with Essing's pickup; (2) Agent Strouse grossly misrepresented seeing a transaction between M.D. and someone in Essing's pickup; and (3) Agent Strouse omitted information about the recording of CS#1's meeting with M.D. around September 6, 2017. The court must determine whether Agent Strouse omitted material information from or included misleading information in the affidavit, whether he did so intentionally or with reckless disregard for the truth, and whether the inclusion of omitted information or omission of the misleading statements would have altered the finding of probable cause. *See United States v. Finley*, 612 F.3d 998, 1002-03 (8th Cir. 2010).

For his first argument, Essing raises Agent Strouse's omission of information about the stops M.D. made between Des Moines and Fort Dodge and that M.D. entered the restaurant after the brief encounter with Essing's pickup. Essing argues the affidavit, as written, makes it appear that M.D. drove directly to meet with Essing in Fort Dodge and then directly back to Des Moines. This does not seem to be a material omission. It is possible, as Essing argues, that M.D. collected drug proceeds and delivered drugs during the other stops or at the restaurant, and not during her encounter with Essing's pickup. It is equally possible, however, that M.D. conducted drug transactions during multiple stops (including during M.D.'s encounter with the person in Essing's pickup). It also seems likely that some of M.D.'s stops before arriving in Fort Dodge did not involve drug transactions. For example, Agent Studer observed M.D.

11

parked at a gas pump and getting food at the Quick Trip in Des Moines. *See* Ex. B. Regardless of whether M.D. made other stops, Agent Strouse reasonably concluded that M.D.'s interaction with a person inside Essing's pickup was related to drug trafficking. It is therefore questionable whether Agent Strouse omitted *material* information about M.D.'s other stops.

Essing next argues that Agent Strouse misrepresented his observations of M.D.'s interaction with Essing's pickup because Agent Strouse could not have seen what actually occurred. The affidavit stated that Agent Strouse saw M.D. arrive at the restaurant around 9:45 p.m., from which the judge could find it was likely dark outside. Agent Strouse worded the affidavit to make it clear the limitations of his observations:

> Your affiant observed [M.D.] meet with a white Ford Ranger . . . registered to Craig Essing. Your affiant observed [M.D.] lean inside Essing's truck and appeared to conduct some sort of transaction. Your affiant was unable to exactly determine what was exchanged.

Ex. 1 at 10. Similarly, Agent Strouse qualified his observations of the driver of Essing's pickup, describing him as "an older white male with longer shaggy type hair . . . similar in appearance to Essing although your affiant was not able to definitively identify Essing as the driver." *Id.* There is no question that the observations by Agent Strouse were material—the judge noted in the endorsement "[p]ersonal observation of 'drop' which was supported by other information" as information received in support of the application. Ex. 1 at 13. Agent Strouse and even the judge could reasonably infer that M.D. engaged in a drug-related transaction with someone in Essing's pickup based on Agent Strouse's observations of M.D. leaning in the window of the pickup for a few minutes after traveling from Des Moines to Fort Dodge, and the pickup immediately leaving the parking lot after that interaction. Agents are allowed to make reasonable inferences in drafting affidavits for search warrants, and judges may draw reasonable inferences from the totality of the circumstances in determining probable cause. *United States v. Brackett*, 846 F.3d 987, 992 (8th Cir. 2017). Agent Strouse's observations of

12

M.D. leaning into Essing's pickup reasonably support the conclusion that a drug-related transaction occurred. I do not find that Agent Strouse misrepresented his observations. To the contrary, he carefully worded the affidavit to illustrate the limitations of what he was able to see. This also demonstrates Agent Strouse's apparent intention to be forthright in the affidavit, as opposed to recklessly or intentionally misleading the judge.

Essing also argues that Agent Strouse should have stated that the audio recording of CS#1's conversation with M.D. on September 6th did not capture M.D.'s alleged statements about delivering methamphetamine and heroin to, and collected drug money from, "the old man" in Fort Dodge. Essing argues this is essential information that goes to CS#1's credibility. At the direction of law enforcement, CS#1 recorded the meeting in question with M.D. and others. *See* Ex. B. Large parts of the conversation, however, were inaudible due to background noise and other issues. *Id.* Essing acknowledges that at least portions of the conversation were in Spanish, and there is no indication that any of the agents spoke Spanish or reviewed a translation of the audio recording. For these reasons, the recording neither confirmed nor contradicted CS#1's account of what M.D. said during the meeting. Therefore, the affidavit needed to contain sufficient information for the judge to determine whether CS#1 was reliable. CS#1 told agents what M.D. purportedly said shortly after the conversation, which shows the information was fresh in CS#1's mind. In addition, as explained below, the affidavit contained sufficient information for the judge to find CS#1 was credible and provided reliable information.

Agents first corroborated information provided by CS#1. *See United States v. Crissler*, 539 F.3d 831, 835 (8th Cir. 2008) (collecting cases) (corroboration of even parts of an informant's information sufficient to show reliability). Agents confirmed postal packages had been sent from California to Iowa and identified M.D. as a person involved in making bank deposits of United States currency that smelled of marijuana, which corroborated the historical information CS#1 provided to Agent Studer. *See* Ex.

13

B at 8-9. Agents' surveillance on August 31st also corroborated CS#1's prediction that M.D. would travel to Fort Dodge that day, as well as CS#1's information on September 6th of M.D.'s alleged statements about delivering drugs and collecting money from "the old man" in Fort Dodge. The ability to corroborate innocent details about an informant's prediction of another person's future actions may support a finding of probable cause. *See United States v. Reiner Ramos*, 818 F.2d 1392, 1397-98 (8th Cir. 1987) (discussing *Illinois v. Gates*, 462 U.S. 213 (1983), and *Draper v. United States*, 358 U.S. 307 (1959)).

In addition, Agent Strouse demonstrated that CS#1 was otherwise reliable. When information from an informant is corroborated in part or the affiant establishes the informant's reliability through other means, a failure to include other information (such as the informant's prior criminal convictions or cooperation with law enforcement) does not defeat a judge's finding of probable cause based on the informant's information. *See Williams*, 477 F.3d at 559-60 (reliability may be based on at least partial corroboration of an informant's information, or the informant's history of providing reliable or truthful information to law enforcement); *see also Carnahan*, 684 F.3d at 735 (same); *United States v. Gabrio*, 295 F.3d 880, 883 (8th Cir. 2002) (reliability can be based on informant providing reliable information in the past, including information that led to arrests or seizure of contraband or evidence, informant's first-hand observations of information provided to law enforcement, informant's involvement in criminal activity, or an agent's ability to assess informant's credibility when informant provides information to agent in person). The Informant's Attachment outlined CS#1's record of providing reliable information (at least 100 times over the course of five months, including information that led to multiple arrests and criminal charges, the issuance of five search warrants, and the seizure of stolen property and contraband). Agent Strouse also explained that CS#1 implicated him/herself in criminal activity (demonstrating CS#1's basis of knowledge and reliability) and that CS#1 was cooperating in consideration for felony drug charges

14

(thereby not withholding information relevant to the credibility determination). The affidavit contained more than sufficient information from which the judge could reasonably find that CS#1's information was reliable.

Under the second *Franks* consideration, even if Agent Strouse had made a material misrepresentation or omission, Essing fails to show that Agent Strouse acted improperly. There is absolutely no indication that Agent Strouse intentionally omitted or misrepresented information in the affidavit. Even if omitted or misrepresented information were material to the probable cause finding, that fact does not demonstrate the affiant acted intentionally or with reckless disregard for the truth. *Finley*, 612 F.3d at 1002. In determining whether an agent acted intentionally or with reckless disregard, the court should consider "whether, viewing all of the evidence, the affiant must have entertained serious doubts as to the truth of his statements, or had obvious reasons to doubt the accuracy of the information he reported." *Id.* (quoting *United States v. Clapp*, 46 F.3d 795, 801 n.6 (8th Cir. 1985)). As noted above, Agent Strouse carefully worded the affidavit to reflect the limitations of his observations and provided detailed information about CS#1. Essing has failed to meet his burden of showing that Agent Strouse made a false statement or material omission either intentionally or with reckless disregard for the truth.

Finally, as discussed in the next section, even if the argued omissions were included in the affidavit, sufficient information supported the judge's probable cause finding. For each of these reasons, Essing has failed to meet his burden of showing he is entitled to a *Franks* hearing and of establishing a *Franks* violation.

### C. Probable Cause

The affidavit in this case, even including the omissions raised by Essing, supports a finding of probable cause. This information includes the following:

15

- CS#1's statements in August 2017 regarding methamphetamine distribution and identification of M.D. as being involved in the ongoing activity;
    - Law enforcement's corroboration of those statements by verifying postal parcels shipped from California to Iowa, and the identification of M.D. as a person making bank deposits of suspected drug payments or proceeds;
- CS#1's prediction about M.D.'s July 31st trip to Fort Dodge to collect money;
    - Agents' corroboration of M.D.'s travel from Des Moines to Fort Dodge, including stops made in and between those locations;
    - Agent Strouse's observation of M.D. briefly interacting with a person in Essing's pickup who appeared to match Essing's description; and
    - Agent Strouse's observation of apparent counter-surveillance techniques after that interaction; and
- prior information from M.L.A. and A.R. that a person agents believed to be Essing was previously involved in drug trafficking.

This information supports a finding of probable cause to believe that agents would likely find evidence of drug distribution (including drug ledgers, financial records, and packaging material or scales) in the white Ford Ranger, on Essing's person, and at his residence. Because sufficient information would still support a finding of probable cause, Essing's challenge under *Franks* and his probable cause argument both fail.

Essing raises concerns with the reliability of information from M.L.A. and A.R. In the affidavit, Agent Strouse explained that M.L.A. implicated himself in the drug-trafficking activity and provided innocent details that agents corroborated (older white male, lived on the south side of Fort Dodge, and previously worked in a hospital-type setting). Ex. 1 at 9. The judge could find that M.L.A. was credible based on that information. Agent Strouse also provided information about why A.R. was cooperating

16

and that A.R. implicated himself in drug-trafficking activity. Ex. 1 at 10. Agent Strouse also indicated that A.R. indicated A.R. distributed multiple-ounce quantities of methamphetamine to "Craig" who goes by the nickname "Pops" (*id*.), and agents confirmed "Pops" was a known nickname used by Essing. This may have been sufficient information to find A.R.'s information reliable (Agent Young's belief in A.R.'s reliability is not included in the warrant, but does demonstrate good faith for the agents' reliance on the search warrant). My main concern is that the affidavit states that A.R. said "he sold Craig Essing" methamphetamine, when in fact Agent Young testified A.R. only identified the person as "Craig" who goes by the nickname "Pops." Even if all information from A.R. were removed from the affidavit, however, sufficient information remains to support a finding of probable cause.

Essing also argues the information in the affidavit was stale and did not support a search of Essing's residence and vehicle at the time the warrant was issued. "A warrant becomes stale if the information supporting the warrant is not sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search." *United States v. Davis*, 867 F.3d 1021, 1028 (8th Cir. 2017) (quoting *United States v. Johnson*, 848 F.3d 872, 876 (8th Cir. 2010)). "[N]o fixed formula [exists] for deciding when information has become stale, but [courts] consider the nature of the crime being investigated and the property to be searched." *Id.* (quoting *United States v. Nieman*, 520 F.3d 834, 839 (8th Cir. 2008)). Agent Strouse described ongoing drug-trafficking activity in the affidavit, and in particular information about M.D. meeting with a person believed to be Essing on July 31st. The information from CS#1 on September 6th demonstrated that Essing would likely be involved in future activity (both the distribution of drugs and the collection of drug proceeds). Agent Strouse provided numerous statements based on his training and experience that persons involved in drug trafficking often maintain various forms of evidence and tools of the trade (including drug ledgers, contact information, financial

17

records, cellular telephones, firearms, photographs, and surveillance equipment) at their residences and in their vehicles. *See* Ex. 1 at 3-8. These types of items are likely to be maintained for longer periods of time than actual drugs, and the judge could properly find that such evidence would likely be found at Essing's residence, in his white Ford Ranger, and on his person one week after the meeting with M.D. in Fort Dodge. *See Davis*, 867 F.3d at 1028 (collecting cases) (information in drug investigations may not be stale even with intervals of weeks or months between activity). In addition, the judge could reasonably infer that at least a portion of the nine pounds of methamphetamine that M.D. purportedly provided to Essing on or near August 31st would still be found at his residence or in the white Ford Ranger approximately one week later. This inference is supported by Agent Young's testimony during the suppression hearing. It was also possible (although less likely) that Essing would still be in possession of a record from drug transactions with M.L.A. that occurred in 2016 and with A.R. in 2015. The information from A.R. and M.L.A. support a finding that Essing was engaged in ongoing drug-trafficking activity and corroborated the information from CS#1. The affidavit provided sufficient information to support the judge's finding that the items listed would be found on Essing's person, at his residence, and in his white Ford Ranger.

### *D. Good Faith*

Even if the affidavit lacked probable cause to support the search warrant, the agents in this case relied in good faith on the warrant. The extreme sanction of "the exclusionary rule is designed to deter police misconduct," and does not require suppression of "evidence seized by officers who act in objectively reasonable, good faith reliance upon issued warrants." *Carpenter*, 341 F.3d at 669 (quoting *Leon*, 468 U.S. at 916). Because I do not find that the affidavit was misleading or that Agent Strouse acted intentionally or recklessly in providing information to the judge, the good faith exception should apply. *See id.* Agent Strouse appears to have carefully written the

affidavit to make clear the limitations of his observations and information. The affidavit was not so lacking in probable cause to render any reliance on the warrant by an officer entirely unreasonable. *See id*. at 670-72. Indeed, Agent Young believed it was highly likely that agents would find evidence of drug distribution (in addition to methamphetamine) during the search, and he believed the warrant was based on probable cause. This is supported by the affidavit's information of Essing's alleged involvement in drug trafficking activities since 2015. Officers may rely in good faith on a warrant to search a location connected to a defendant when an affiant describes the defendant's "continuous course of drug trafficking activity" and states that based on the affiant's training and experience, the warrant will likely lead to evidence of drug trafficking. *United States v. Ross*, 487 F.3d 1120, 1123-24 (8th Cir. 2007) (finding officer reasonably relied on warrant to search defendant's residence when no information connected residence to drug trafficking, but an informant provided information that a load of marijuana in a controlled delivery was destined for defendant).

The remaining exceptions to the good faith exception do not appear to apply in this case. Therefore, even if the affidavit lacked sufficient probable cause to issue the warrant (which I do not believe is the case), the agents relied in good faith on the issuing judge's determination of probable cause and issuance of the search warrant.

### III. CONCLUSION

For the foregoing reasons, I RESPECTFULLY RECOMMEND that Defendant's motion to suppress (Doc. 56) be **denied**.

Objections to this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1), Federal Rule of Criminal Procedure 59(b), and Local Criminal Rule 59, must be filed within fourteen days of the service of a copy of this Report and Recommendation; any response to the objections must be filed within seven days after service of the objections. A party asserting such objections must arrange promptly for

the transcription of all portions of the record that the district court judge will need to rule on the objections. LCrR 59. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to de novo review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

DATED this 31st day of August, 2018.

Kelly K.E. Mahoney
United States Magistrate Judge
Northern District of Iowa