**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

UNITED STATES OF AMERICA,

              Plaintiff,

vs.

CRAIG ESSING,

              Defendant.

No. CR17-3047-LTS

**ORDER**

_____

      This matter is before me on a Report and Recommendation (R&R) in which the Honorable Kelly K.E. Mahoney, Chief United States Magistrate Judge, recommends that I deny defendant's motion (Doc. No. 56) to suppress. Doc. No. 66. Defendant Craig Essing (Essing) filed timely objections (Doc. No. 71) on October 5, 2018, and the Government filed a resistance (Doc. No. 74) on October 10, 2018.

## I.     *BACKGROUND*

### A.   *Procedural History*

      On September 20, 2017, the grand jury returned an indictment (Doc. No. 1) charging Essing with one count of conspiracy to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 846 (Count I), one count of possession with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) (Count II) and one count of possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c) (Count III). The grand jury returned a superseding indictment (Doc. No. 35) on November 30, 2017, charging the same three counts, but with additional quantities on Count II and additional firearms on Count III.

On June 22, 2018, Essing filed a motion (Doc. No. 56) to suppress. The Government filed a resistance (Doc. No. 57) on June 27, 2018. Judge Mahoney held a hearing on July 18, 2018. *See* Doc. No. 64. She found Essing did not make the required preliminary showing to warrant a *Franks* hearing but conducted an evidentiary hearing on the issue of the officers' good faith reliance on the warrant. *Id.* The Government presented testimony from Special Agent Eric Young with the Iowa Division of Narcotics Enforcement (DNE). *Id.* Judge Mahoney admitted Government Exhibits 1 through 5 and defense Exhibits A and B. *Id.*

Judge Mahoney issued her R&R (Doc. No. 66) on August 31, 2018.[1] Trial is scheduled to begin December 3, 2018. *See* Doc. No. 65.

**B.     Relevant Facts**

Judge Mahoney summarized the following relevant facts based on the exhibits and testimony presented during the suppression hearing:

> On September 7, 2017, Special Agent Bryant Strouse with DNE submitted an application and affidavit for a state warrant to search Essing's person, white Ford Ranger pickup, and residence located in Fort Dodge, Iowa. Ex. 1. The same date, an Iowa district judge in Webster County issued the requested warrant, authorizing the search for evidence of drug-trafficking activities. Ex. 1. The affidavit submitted in support of the warrant outlined Agent Strouse's training and experience, included information about common drug-trafficking methods, and summarized the investigation of Essing's alleged involvement in distributing methamphetamine. *Id.* The affidavit included the following information about this investigation:
>
> - During a debriefing in July 2015, federal defendant A.R. provided information about supplying "Craig Essing" with methamphetamine during the summer of 2015. A.R. said that "Essing goes by the nickname 'Pops'" and indicated that these drug transactions occurred at Essing's residence (the affidavit does not indicate where that residence is located).

---

[1] Essing was granted an extension of time to file objections to the R&R.

- o Agent Strouse was aware that Essing has resided at his current residence (identified in the application as the residence to be searched in Fort Dodge) since before 2015. Ex. 1 at 10.

- Special Agent Matt Anderson with DNE provided information about the November 2016 arrest of M.L.A. in Des Moines, Iowa. M.L.A. was in possession of $100,000 in United States currency and a stolen firearm. M.L.A. described his prior distribution of methamphetamine to and collection of United States currency from two people in Fort Dodge – on an "unidentified old white male [who] lived on the South side of Fort Dodge and worked in a hospital setting as some type of therapist." M.L.A. stated this older white male received 30-pound quantities of methamphetamine and stored the methamphetamine in a tire or washing machine.
  - o Agents verified that Essing previously worked as a nurse and that his residence is on the south side of Fort Dodge. Ex. 1 at 9.

- In August 2017, Special Agent Eric Studer with DNE received information from a confidential source (CS#1) about the receipt of multiple pounds of methamphetamine in the Des Moines area and cash deposits made into bank accounts to pay for the methamphetamine. CS#1 identified M.D. as a person who made cash deposits into these bank accounts. Ex. 1 at 8.

- On August 31, 2017, Agent Studer relayed information from CS#1 that M.D. was en route to Fort Dodge from the Des Moines area to collect money.
  - o Agents conducting surveillance saw M.D. driving a vehicle registered to M.D.
  - o Agent Strouse saw M.D. arrive at a restaurant in Fort Dodge at around 9:45 p.m. and "meet with a white Ford Ranger" registered to Essing. Agent Strouse "observed [M.D.] lean inside Essing's truck and appeared to conduct some sort of transaction," although Agent Strouse "was unable to exactly determine what was exchanged."
  - o Agent Strouse described the driver of the white Ford Ranger as "an older white male with longer shaggy type hair . . . similar in appearance to Essing," although Agent

3

Strouse "was not able to definitively identify Essing as the driver."

- o The white Ford Ranger left the restaurant approximately ten minutes later and Agent Strouse "observed the Ford Ranger drive in a manner consistent with conducting counter-surveillance [by] circling the block and driving slowly." Agent Strouse followed the white Ford Ranger to Essing's neighborhood but discontinued surveillance at that time "due to the observations of counter-surveillance."
- o Agent Strouse saw the white Ford Ranger parked at Essing's residence the next morning (September 1, 2017) and has seen it parked there "on numerous occasions since." Ex. 1 at 10.

- Agent Studer met with CS#1 on September 6, 2017, and CS#1 relayed that M.D. told CS#1 that M.D. "recently delivered nine (9) pounds of methamphetamine to 'the old man' in Fort Dodge." CS#1 also said that M.D. "collected $103,000 from 'the old man' in Fort Dodge and delivered nine (9) grams of heroin to 'the old man.'"
    - o Agent Strouse knows that Essing goes by the nickname "Pops" and believed, based on his observations and information known about Essing, that Essing was "the old man" that M.D. discussed with CS#1. Ex. 1 at 11.

- Agent Strouse outlined methods he knows to be used by drug traffickers based on his training and experience. Ex. 1 at 3-8.

Agent Strouse included an "Informant Attachment" for CS#1, indicating that CS#1:

- is a concerned citizen known to Agent Studer for five months;
- is a mature individual;
- is a person of truthful reputation;
- has otherwise demonstrated truthfulness;
- has provided information at least 100 times that has led to:
    - o five search warrants,
    - o multiple arrests,
    - o numerous drug-related charges, and
    - o the seizure of stolen property, drugs, or other contraband;
- has not given false information in the past; and

- provided information during the current investigation that law enforcement corroborated.

Ex. 1 at 12. Agent Strouse also included information from the Webster County Assessor about Essing's residence. Ex. 1 at 20-22.

In endorsing the search warrant application, the judge handwrote "see affidavit attached" and "[p]ersonal observation of 'drop' which was supported by other information" under the "Abstract of Testimony" section. Ex. 1 at 13. The judge marked that he relied in part on the information from an informant (CS#1), that the informant had given reliable information on previous occasions, and that the judge found the informant's information reliable because "[i]nformation reliable historically [and] supported by other independent evidence." *Id.*

Officers executed the warrant on September 8, 2017. Agents seized several items from Essing's person, the residence, and detached garage, including: suspected methamphetamine, United States currency, firearms, ammunition, digital scales, and packaging material with suspected drug residue. Special Agent Young participated in the execution of the search warrant and identified Essing during the suppression hearing (whose features match the general description of an older male with white, shaggy hair, *see* Ex. 3). Agent Young had reviewed the search warrant and testified he believed the warrant was supported by probable cause. He was not aware of Agent Strouse acting in bad faith in seeking or executing the search warrant.

Agent Young testified about law enforcement practices and his knowledge of general drug-trafficking methods, to include the following:

- *Recordings by informants*: Although informants are often given recording equipment, that equipment does not always work.

- *Surveillance*: Agents conduct surveillance to try and observe what is happening and yet work to avoid being seen by the people under surveillance. Agents use their own eyes, binoculars, and electronic equipment (such as tracking devices) to conduct surveillance and can effectively conduct surveillance at night.

- *Quantities of methamphetamine*: Distribution quantities of methamphetamine vary and could include one-sixteenth (1/16) of

an ounce, commonly known as a "teener," and would definitely include quantities of at least one-eighth (1/8) ounce, commonly known as an "eight-ball."

- *Indicia of distribution*:  Common indicia of drug distribution include large sums of United States currency, large quantities of drugs, packaging materials, surveillance equipment, firearms, drug ledgers, and electronic devices.

- *Storage of drugs*:  Drug distributors often store drugs at locations where they can be safe-guarded from theft.  Distributors often use firearms to protect drugs and United States currency.

- *Counter-surveillance techniques*:  Persons involved in drug distribution may use counter-surveillance to determine whether they are being followed by law enforcement (to avoid detection) or by competitors or others (to avoid theft of drugs or United States currency).

- *Travel*:  It is not uncommon for drug distributors to make stops when they take longer trips related to drug distribution.

- *Distribution*:  It would be unusual for a person to be able to redistribute a quantity of nine pounds of methamphetamine in one week, and Agent Young would have a high expectation that at least a portion of the nine pounds would still be present one week after it was received for distribution.  Although grams can be redistributed quickly, it often takes much longer to redistribute pound-quantities of methamphetamine.

- *Retaining evidence of distribution*:  Drug distributors often retain evidence distribution (such as drug ledgers, packaging material, surveillance equipment, and United States currency) for longer periods of time after the actual drugs have been sold.

Agent Young acknowledged a report by Agent Studer about the surveillance conducted August 31, 2017 (M.D.'s trip to Fort Dodge from the Des Moines area) (Ex. B), that listed the following stops made by M.D. after beginning the trip to Fort Dodge:

- 12-minute stop at Dollar General in Des Moines (observed via tracking device surveillance);

- 1-minute stop, parked in an alleyway between residences in Des Moines (observed via tracking device surveillance);

- 14-minute stop at a Quick Trip gas station in Des Moines (observed via tracking device surveillance and visual surveillance by Agent Studer)

- 9-minute stop at a rest area on northbound Interstate 35 (observed via tracking device surveillance and visual surveillance by Agent Studer); and

- M.D. entered the restaurant after meeting with the person in Essing's white pickup in the parking lot.

Ex. B at 2-3. The tracking device surveillance report reflected Agent Strouse's observations that were included in the affidavit:

- M.D. arriving at the restaurant parking lot and "meeting with a white male at the driver side of a white Ford Pickup truck [registered to Essing,] . . . leaning inside the window" of the pickup a few minutes after arriving; and

- the pickup leaving the parking lot "driv[ing] in a manner consistent with conducting counter surveillance" that included "numerous turns that amounted to driving in circles."

*Id.* at 3. Approximately twenty-five minutes after Essing left the parking lot, Agents Studer and Strouse saw M.D. walk out of the restaurant to M.D.'s car and drive away. *Id.* According to tracking device surveillance, M.D. then traveled directly back to the same Quick Trip in Des Moines. *Id.*

Agent Young also acknowledged that another report by Agent Studer (Ex. A) shows that agents provided CS#1 with a recording device prior to the September 6, 2017, meeting with M.D. (during which CS#1 said M.D. talked about delivering methamphetamine and heroin to and collecting United States currency from "the old man" in Fort Dodge). The report does not state that agents overheard M.D. make these statements reported

7

by CS#1. The report indicates that CS#1 told agents the purported statements by M.D. when agent debriefed CS#1 after the meeting. *See* Ex. A.

Agent Young testified that he was the case agent in A.R.'s federal drug case and was aware of the information A.R. provided related to the Essing investigation. Specifically, A.R. identified "Craig" (not "Craig Essing") as a methamphetamine distributor who lived near the "Flats" of Fort Dodge and went by the nickname "Pops." A.R. never identified Essing by photograph, but Agent Young was aware from other informants and general word on the street that Essing goes by the nickname "Pops." Agent Young was also aware that Essing lived near the Flats, which is a neighborhood on the south side of Fort Dodge. Agent Young was not aware of any other persons known as "Craig" or "Pops" who lived near the Flats. Agent Young believed A.R.'s information was credible. Although A.R. had delivered methamphetamine to Essing in 2015, Agent Young believed it would not be uncommon for Essing to still possess drug ledgers or similar items related to drug transactions with A.R. from 2015.

Doc. No. 66 at 2-9 (footnotes omitted).

## II. STANDARD OF REVIEW

A district judge must review a magistrate judge's R&R under the following standards:

Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b). Thus, when a party objects to any portion of an R&R, the district judge must undertake a de novo review of that portion.

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). However, a district judge may elect to review an R&R under a more-exacting standard even if no objections are filed:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 150 (1985).

## III. DISCUSSION

Essing seeks a *Franks* hearing[2] with regard to the search warrant affidavit based on information in the warrant that he characterizes as misleading or a material omission. *See* Doc. No. 56-1. He argues that, based on this same information, the search warrant lacked probable cause and the good faith exception would not apply. *Id.*

Essing objects to both factual findings and legal conclusions in the R&R. I will discuss his objections to factual findings first, followed by his objections to the legal conclusions.

---

[2] A *Franks* hearing is appropriate to challenge a facially valid affidavit for a search warrant if defendant makes a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit" and such statement is "necessary to the finding of probable cause." *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978).

*A.* **Factual Objections**

*1.* **Multiple Stops**

First, Essing objects to the finding that "Studer relayed information from CS#1 that M.D. was en route to Fort Dodge from the Des Moines area to collect money." *See* Doc. No. 66 at 3. Essing argues this improperly infers that M.D. was going to Fort Dodge to collect money from one person – the defendant. He points out that CS#1 told Studer that M.D. "planned to collect money from their drug customers." *See* Doc. No. 63-2 at 1. He argues the multiple stops recorded by GPS (and not personally observed by agents) is consistent with M.D. collecting drug debts and that such stops should have been included in the affidavit.[3] *See* Doc. No. 71 at 2. He argues agents did not rule out the collection of drug debts prior to M.D.'s arrival in Fort Dodge, because the stops were not witnessed by an agent personally.

The Government asserts that it is not uncommon for individuals involved in drug trafficking to make several stops, some of which may be innocent, and that this is consistent with Young's testimony. *See* Doc. No. 74 at 4.

Essing objects to the finding that "it is not uncommon for drug distributors to make stops when they take longer trips related to drug distribution." *See* Doc. No. 71 at 4 (quoting Doc. No. 66 at 7). He further objects to a finding that the full time period of the stops at the Quick Trip in Des Moines and rest area on I-35 were witnessed by visual surveillance. He points out that after meeting with Essing, M.D. entered a restaurant/bar and was out of visual and electronic surveillance for almost 25 minutes.

Judge Mahoney summarized Young's testimony that based on his training and experience, it was not uncommon for drug distributors to make stops when they take longer trips related to drug distribution. With regard to the visual surveillance at some of the stops, Judge Mahoney noted they were "observed via tracking device surveillance

---

[3] Whether or not the stops should have been included in the affidavit is a legal question that will be addressed *infra* Section III(B)(1).

and visual surveillance by Agent Studer." *See* Doc. No. 66 at 7. She did not specify how long the visual surveillance lasted. Defendant's Exhibit B states that at about 7:40 p.m. Studer observed (via electronic surveillance) M.D.'s vehicle at a Quick Trip gas station. Doc. No. 63-2 at 2. At about 7:45 p.m. Studer arrived at the gas station and observed M.D.'s vehicle parked at the gas pumps. The vehicle was unoccupied and Studer went into the Quick Trip store. He observed M.D. and the person he believed to be a passenger in M.D.'s vehicle. M.D. was obtaining hot dogs. He observed them head back to the vehicle at about 7:48 p.m. and then depart the gas station and travel north on I-35 at 7:54 p.m. *Id.* At about 8:09 p.m. Studer observed (via electronic surveillance) that M.D.'s vehicle was stopped at a rest stop. *Id.* At 8:18 p.m., he observed M.D.'s vehicle leave the rest area and travel north onto I-35. *Id.* at 3. He did not observe other vehicles in the vicinity of M.D.'s vehicle when it departed the rest area. *Id.* With regard to M.D.'s movements following the meeting with the person in Essing's white Ford Ranger, agents observed M.D. and her passenger exit the restaurant (after approximately 20 minutes) and return to the vehicle. *Id.* They verified it traveled back to Des Moines via electronic surveillance. *Id.* at 3-4.

It is entirely possible that M.D. could have been collecting drug debts prior to meeting with the individual in the white Ford Ranger. It is also possible that the stops were innocent conduct. Either way, I do not find the lack of specificity regarding the finding that "M.D. was en route to Fort Dodge from the Des Moines area to collect money" to be problematic given that no evidence establishes that M.D. did in fact collect money from multiple individuals. The factual finding accurately reflects the information provided by CS#1. While I appreciate the additional information from Essing regarding the possible inferences to be drawn from that statement, he has not demonstrated that the finding itself is inaccurate. With regard to the finding that it is not uncommon for drug distributors to make stops when they take longer trips, Judge Mahoney was merely summarizing Young's testimony and Essing has not demonstrated that this is inaccurate or that Young is not credible. Finally, with regard to the surveillance, I will take the

additional detail provided by Defendant's Exhibit B into account in evaluating probable cause, but I find no error with regard to the findings made by Judge Mahoney in her R&R as it is a summary of Defendant's Exhibit B. While her summary is not as detailed as the surveillance report itself, the surveillance report also does not contain the detail that Essing wants to infer, such as meetings with other people. Although such meetings are certainly possible, there is no evidence that any such meetings took place. Judge Mahoney's findings accurately reflect the evidence. Essing's objections related to M.D.'s multiple stops are overruled.

### 2.    *Description of Driver*

Essing next objects to the finding that Strouse was able to identify the driver of the white Ford Ranger with the specificity of "an older white male with long shaggy type hair . . . similar in appearance to Essing." *See* Doc. No. 66 at 4. He points out that although Strouse is the only officer who allegedly witnessed the individual in the white pickup and is also the officer who wrote the application for the warrant, he was not called to testify at the hearing. Essing contends the best evidence of who Strouse observed in the white Ford pickup is the surveillance report from August 31, 2017, in which Strouse stated he witnessed a "white male" in the white Ford Ranger without further specificity. *See* Doc. No. 63-2 at 3. Essing contends that further details provided in the search warrant affidavit come from defendant's driver's license and not from Strouse's personal observations.

The Government points out that Strouse acknowledged in his affidavit that "the subject was similar in appearance to ESSING" but that he was "not able to definitively identify ESSING as the driver of the white Ford Ranger." *See* Doc. No. 60 at 10. Judge Mahoney included this exact finding in her R&R. *See* Doc. No. 66 at 4. The Government also points out that Strouse's testimony at Essing's detention hearing was consistent with

his affidavit and that the surveillance report Essing relies on was not drafted by Strouse himself.[4]  *See* Doc. No. 74 at 3.

I find no error with regard to the factual finding that Strouse "described the driver of the white Ford Ranger as 'an older white male with longer shaggy type hair . . . similar in appearance to Essing' although Agent Strouse 'was not able to definitively identify Essing as the driver.'"  Doc. No. 66 at 4.  Essing essentially argues that Strouse observed only a "white male," *see* Doc. No. 63-2, in the white Ford Ranger and that it is inaccurate to state in the affidavit that he observed "an older white male with longer shaggy, type hair," which he contends was actually based on Essing's driver license as the registered owner of the vehicle.  *See* Doc. No. 60 at 10.  Because Strouse did not testify at the hearing, the record is somewhat unclear as to what he actually observed.[5]  Nonetheless, I find no error with regard to Judge Mahoney's factual finding, as she merely quoted what Strouse had described in the affidavit.  While the surveillance report is less detailed in this respect that does not necessarily mean it accounted for the full extent of Strouse's observation.  As the Government pointed out, Strouse did not author this report.  *See* Doc. No. 63-2 at 1 (indicating Studer authored the report).  Because there is no evidence in the record that Strouse observed only a "white male" in the Ford Ranger and not a "white male with longer, shaggy, type hair," this objection is overruled.

Essing also challenges the finding that "the old man" identified by M.D. is the same person as Essing.  He argues the only information agents had regarding a "Craig" who was suspected of delivering drugs in Fort Dodge had the nickname "Pops," not "the old man."  He argues that "old man" is a common pseudonym used by drug dealers and

---

[4] The Government's explanation for Strouse's absence is discussed in footnote 7, *infra*.

[5] At the detention hearing, Strouse testified: "I observed [an] individual that I believed to be Craig Essing based on what I knew I could identify as an older white male with the way I'd describe it as kind of bushy, shaggy-type hair.  And again, it was consistent with Mr. Essing's appearance."  *See* Doc. No. 62 at 10.

that there is no showing that "Pops" and "the old man" are the same person, much less Essing.

Judge Mahoney did not make a factual finding that "the old man" identified by M.D. to CS#1 is Essing. Rather, she stated: "Agent Strouse knows that Essing goes by the nickname 'Pops' and believed, based on his observations and information known about Essing, that Essing was 'the old man' M.D. discussed with CS#1. Ex. 1 at 11." Doc. No. 66 at 4. Essing has not pointed to anything in the record to suggest that Strouse's belief that "the old man" was Essing was unreasonable. While it is conceivable that the "old man" may be a common name among drug dealers, several pieces of information led Strouse to connect that name to Essing. First, in 2015 A.R. identified "Craig" as a methamphetamine distributor who lived near the Flats of Fort Dodge and went by the nickname Pops." *See* Doc. No. 60 at 10. Second, M.D. told CS#1 that she delivered methamphetamine to "the old man" in Fort Dodge. *Id.* at 11. Strouse had observed a transaction between M.D. and a white male in a Ford Ranger earlier that week. The vehicle was registered to Craig Essing and observed at Essing's residence. *Id.* This matched information provided by M.A. in 2016 that an older white male who lived on the south side of Fort Dodge and worked in a hospital setting had distribution quantities of methamphetamine. *Id.* at 9. Strouse further verified that Essing previously worked as a nurse and had lived at his residence since prior to 2015. *Id.* at 9-10. Nothing in the record undermines Strouse's belief that Essing was the "old man" identified by M.D. This objection is overruled.

### 3. *Hand-to-Hand Transaction*

Essing attempts to cast doubt on the alleged transaction between M.D. and Essing by arguing that the exchange of $103,000 should have been visible. *See* Doc. No. 71 at 4 ("It is incomprehensible that Agent Strouse could not have seen the passing of this best-case scenario of 1030 cash bills, assuming that he could truthfully see any 'transaction' occurring."). The Government points out that Essing could have concealed the drug

proceeds in a bag or other container before handing it to M.D. which would hinder Strouse's ability to observe what was exchanged.

While Essing does not object to any specific factual finding regarding the transaction, I find no error with regard to how it was described in the R&R based on Strouse's affidavit. Judge Mahoney stated that he "observed [M.D.] lean inside Essing's truck, and appeared to conduct some sort of transaction" but "was unable to exactly determine what was exchanged." Strouse later described in the affidavit that after meeting with M.D. a week later, CS#1 told agents that M.D. reported collecting $103,000 from "the old man" in Fort Dodge and delivering nine (9) grams of heroin to "the old man." *See* Doc. No. 66 at 4. Strouse's inability to determine exactly what was exchanged is explained by any number of circumstances and does not eliminate the possibility that $103,000 was part of that exchange. The $103,000 figure came from CS#1 (via M.D.), not Strouse's observations, and the application described the factors supporting the reliability of information from CS#1. This objection is overruled.

### 4.     *Distribution of Nine Pounds Within a Week*

Finally, Essing objects to the finding that "it would be unusual for a person to be able to redistribute a quantity of nine pounds of methamphetamine in one week." *See* Doc. No. 71 at 5 (quoting Doc. No. 66 at 7). Judge Mahoney did not make this finding, but included it in a summary of Young's testimony. Essing argues that Young was not able to testify as to the likelihood that methamphetamine would be present at Essing's residence a week after an alleged delivery was made to Fort Dodge. The Government points out that Young testified he had a "high expectation" that some of the nine pounds provided by M.D. to Essing would be at Essing's residence a week later based on his training and experience. Doc. No. 74 at 4.

I find that this is a fair summary of Young's testimony. He testified, "it would be unusual for that individual who just took possession of nine pounds plus to be able to move or distribute it within a week's time, *see* Doc. No. 69 at 27, and "there's a very

fair chance that some of that methamphetamine is still at the residence." *See* Doc. No. 69 at 41. Essing has not pointed to evidence demonstrating these statements are not credible. This objection is overruled.

### B. *Legal Objections*

#### 1. **Franks** *Hearing*

Essing objects to Judge Mahoney's conclusion that a *Franks* hearing is not warranted. He argues that Strouse omitted material information from the search warrant affidavit and included misleading information in the affidavit. *See* Doc. No. 71 at 5-6. He requests an adverse inference based on Strouse's failure to testify and argues that even without an adverse inference, the stops made by M.D. on her way to and from Fort Dodge were material information that should have been included in the affidavit. He further argues that Strouse's statement that he witnessed a transaction is misleading, given that M.D. stated she received $103,000 in Fort Dodge. *Id.* at 7-8. He contends that such a transaction would be easy to see given the amount of cash exchanged and the fact that Strouse could purportedly view the physical characteristics of the person in the white Ford Ranger.[6]

With regard to CS#1, Essing contends that M.D.'s report of the drug transaction in Fort Dodge was not contained in a recording of this conversation and that failure to include this information in the affidavit is a material omission. *Id.* at 8-9. Essing further argues that the statement in the affidavit that A.R. sold Essing methamphetamine is untrue. *Id.* at 9. He states that A.R. never identified Essing as the individual to whom he sold methamphetamine and that A.R. failed to connect "Craig" to "Craig Essing." *Id.* For all of these reasons, Essing objects to the denial of a *Franks* hearing.

---

[6] Essing also challenges the affidavit regarding what Strouse observed of the person in the vehicle versus what he surmised based on Essing's driver's license photo. *See* Doc. No. 71 at 9.

"In order to be entitled to a hearing under *Franks* the defendant must make a 'substantial preliminary showing' of a false or reckless statement or omission and must also show that the alleged false statement or omission was necessary to the probable cause determination." *United States v. Crissler*, 539 F.3d 831, 833-34 (8th Cir. 2008) (citing *United States v. Milton*, 153 F.3d 891, 896 (8th Cir. 1998)). If defendant makes the substantial preliminary showing of a false or reckless statement or omission, then the court must consider whether "there remains sufficient content in the warrant affidavit to support a finding of probable cause" in the absence of the false material. *Franks v. Delaware*, 438 U.S. 154, 171 (1978).

Judge Mahoney addressed each of Essing's arguments in her R&R. With regard to the omission of M.D.'s stops before and after the alleged transaction she concluded this was not a material omission. She stated:

> It is possible, as Essing argues, that M.D. collected drug proceeds and delivered drugs during the other stops at the restaurant, and not during her encounter with Essing's pickup. It is equally possible, however, that M.D. conducted drug transactions during multiple stops (including during M.D.'s encounter with the person in Essing's pickup). It also seems likely that some of M.D.'s stops before arriving in Fort Dodge did not involve drug transactions. For example, Agent Studer observed M.D. parked at a gas pump and getting food at the Quick Trip in Des Moines. *See* Ex. B. Regardless of whether M.D. made other stops, Agent Strouse reasonably concluded that M.D.'s interaction with a person inside Essing's pickup was related to drug trafficking. It is therefore questionable whether Agent Strouse omitted *material* information about M.D.'s other stops.

Doc. No. 66 at 11-12 (emphasis in original). I agree with Judge Mahoney's analysis on this point. In order for this to be considered a material omission, Essing would need to come forward with more than speculation regarding what occurred during those stops. *See United States v. Carnahan*, 684 F.3d 732, 735 (8th Cir. 2012) ("reckless disregard for the truth may be inferred from the omission of information from an affidavit only when the material omitted would have been clearly critical to the finding of probable cause.") (cleaned up). The surveillance report does not reveal that Studer observed

anything suspicious during each of the two stops he observed. Also, as the Government points out, the stops do not change what Strouse observed between M.D. and Essing. *See* Doc. No. 74 at 7. Without more, I do not find the surveillance report sufficient to amount to a "substantial preliminary showing" of a reckless and material omission in the search warrant affidavit.[7]

With regard to the alleged transaction between M.D. and the person in Essing's vehicle, Essing argues that Strouse either (1) could not have seen what actually occurred or (2) did not specifically describe what he saw because it would be inconsistent with M.D.'s report that she obtained $103,000 from Fort Dodge. Judge Mahoney noted that Strouse worded his affidavit in such a way to identify the limitations of his observations:

> Your affiant observed [M.D.] meet with a white Ford Ranger . . . registered to Craig Essing. Your affiant observed [M.D.] lean inside Essing's truck and appeared to conduct some sort of transaction. Your affiant was unable to exactly determine what was exchanged.

*See* Doc. No. 60 at 10. In describing the person in Essing's pickup, Strouse stated he was "an older white male with longer shaggy type hair . . . similar in appearance to Essing although your affiant was not able to definitively identify Essing as the driver." *Id.* Judge Mahoney concluded these observations were material, as the judge noted in the endorsement: "[p]ersonal observation of 'drop' which was supported by other information." *See* Doc. No. 60 at 13. She found that it was reasonable for Strouse and

---

[7] I do not find it appropriate to draw an adverse inference based on the lack of testimony from Strouse. The Government explained that it had intended to call Strouse as a witness only if Judge Mahoney found a *Franks* hearing was appropriate. *See* Doc. No. 74 at 17-20. It states it chose to have Young testify based on Young's familiarity with the case and the *Leon* exception regarding law enforcement's good faith reliance on the affidavit. *Id.* It also introduced a transcript from Essing's detention hearing, during which Strouse testified regarding the information conveyed in the affidavit. *Id.* Finally, the Government was concerned that in the event the *Franks* hearing was denied (which it was), defendant would utilize the suppression hearing as a de facto *Franks* hearing without having made the substantial preliminary showing. *Id.* I find that these are good reasons – especially in light of the fact that Strouse testified during the detention hearing and was subject to cross-examination at that time. As such, I decline to draw an adverse inference from Strouse's failure to testify during the suppression hearing.

the judge to draw inferences that a drug-related transaction had occurred based on Strouse's observations of M.D. leaning in the window of the pickup for a few minutes after traveling from Des Moines to Fort Dodge and the pickup immediately leaving the parking lot after that interaction. Doc. No. 66 at 12. She did not find that Strouse misrepresented his observations and stated, "[t]o the contrary, he carefully worded the affidavit to illustrate the limitations of what he was able to see." *Id.* at 13. She concluded this demonstrated his "apparent intention to be forthright in the affidavit, as opposed to recklessly or intentionally misleading the judge." *Id.*

I agree with this part of Judge Mahoney's analysis. Again, Essing relies on speculation regarding what an exchange of $103,000 would look like and how much detail Strouse could have really observed regarding the physical characteristics of the pickup's occupant. The substantiality requirement "requires a defendant to offer specific allegations along with supporting affidavits or similarly reliable statements." *United States v. Gonzalez*, 781 F.3d 422, 430 (8th Cir. 2015). Essing's offer of proof is insufficient. I am not convinced that Strouse's affidavit overstates what he actually saw. Indeed, as Judge Mahoney noted, the affidavit identifies the limitations of Strouse's observations with regard to both the transaction and the pickup's driver. These arguments do not amount to a "substantial preliminary showing" that the affidavit contains false or reckless statements.

With regard to M.D.'s statement to CS#1 regarding the exchange of $103,000 and nine grams of heroin, Essing argues that this specific statement did not show up on a recording of the same alleged conversation and that Strouse should have disclosed that in the affidavit. *See* Doc. No. 71 at 8. The alleged conversation took place at a restaurant on September 6, 2017, amongst CS#1, M.D. and two other individuals, during which CS#1 wore a digital audio recorder/transmitter. *See* Doc. No. 63-1. Essing contends that M.D.'s statement should be on the recording. The law enforcement report of the conversation indicates that much of the conversation was inaudible due to background noise. *Id.* at 3. Indeed, the only part that appears audible was a conversation that took

19

place outside the restaurant with CS#1, one of the individuals and a person on the phone. *Id.* at 2. Immediately following the meeting, CS#1 was debriefed and stated that M.D. had said nine and a half pounds of methamphetamine went to the "OLD GUY." *Id.* at 3. There is no mention of the exchange of $103,000 in this report describing the September 6, 2017, conversation and debriefing of CS#1. *Id.* The affidavit states: "CS#1 also later stated [M.D.] collected $103,000 from 'the old man' in Fort Dodge and delivered nine (9) grams of heroin to 'the old man.'" Doc. No. 60 at 11. It is unclear when CS#1 provided this information on September 6, 2017, and when M.D. said it to CS#1.[8]

Because the recording did not confirm or contradict CS#1's report of what M.D. said, Judge Mahoney noted that it came down to whether the affidavit contained sufficient information for the judge to determine whether CS#1 was reliable. Doc. No. 66 at 13. She found that it did based on the fact that CS#1 reported what was said shortly after the conversation, meaning it was fresh in CS#1's mind, other corroborating factors and CS#1's past work with law enforcement. *Id.* at 13-14. In addition to corroborating certain historical information CS#1 had provided about M.D., surveillance on August 31 corroborated CS#1's predication that M.D. would travel to Fort Dodge that day. Surveillance was also consistent with CS#1's report of M.D.'s statements regarding her recent transactions with "the old man" in Fort Dodge. *Id.* at 14. Judge Mahoney also discussed the other information Strouse provided regarding CS#1's reliability. The Informant's Attachment to the search warrant application indicated that CS#1 had provided reliable information at least 100 times over the course of five months, including

---

[8] It seems probable that M.D. did not make this statement at the restaurant given that it does not appear in the report about the debriefing. It is possible that M.D. and CS#1 had a later conversation that day that was then reported to law enforcement. Indeed, during the debriefing, CS#1 placed a call to M.D. that went unanswered. It is possible that M.D. later returned the call to CS#1 and relayed the additional information regarding the exchange of $103,000 and nine grams of heroin. In any event, I find the absence of information regarding when CS#1 told law enforcement this information on September 6, 2017, is immaterial.

information that led to multiple arrests and criminal charges, the issuance of five search warrants and the seizure of stolen property and contraband. *Id.*; *see also* Doc. No. 60 at 12. Strouse also noted that CS#1 had implicated him/herself in criminal activity and was cooperating in consideration for felony drug charges. *Id.* Judge Mahoney concluded the affidavit contained "more than sufficient information from which the judge could reasonably find that CS#1's information was reliable." Doc. No. 66 at 15.

I agree with Judge Mahoney that the existence of the recording from the September 6, 2017, conversation was not an intentional or reckless material omission from the affidavit, as the evidence indicates that the recording was largely inaudible and essentially useless. It is also unclear from the record whether M.D. made the statement to CS#1 at the restaurant or at a later time that day given that the statement was not incorporated into the debriefing report following the restaurant meet-up. Therefore, the reliability of CS#1 is the relevant issue. Strouse provided several factors in the warrant application establishing the reliability of CS#1's information. This information is unchallenged and I find it sufficiently establishes the reliability of CS#1's information.

Finally, with regard to A.R.'s statement that he sold Essing methamphetamine, Essing argues this is untrue, as A.R. stated he sold methamphetamine to "Craig" and never identified "Craig Essing" in particular. Essing argues that Strouse's failure to include this clarification in the affidavit is material, misleading and was either intentional or done with reckless disregard for the truth of what A.R. actually said. *See* Doc. No. 71 at 9-10.

Judge Mahoney addressed this argument in her discussion of probable cause and in the context of the reliability of the other two informants named in affidavit. With regard to A.R., she stated:

> Agent Strouse also provided information about why A.R. was cooperating and that A.R. implicated himself in drug-trafficking activity. Ex. 1 at 10. Agent Strouse also indicated that A.R. indicated A.R. distributed multiple-ounce quantities of methamphetamine to "Craig" who goes by the nickname "Pops" (*id.*), and agents confirmed "Pops" was a known nickname used by

Essing. This may have been sufficient information to find A.R.'s information reliable (Agent Young's belief in A.R.'s reliability is not included in the warrant, but does demonstrate good faith for the agents' reliance on the search warrant). My main concern is that the affidavit states that A.R. said "he sold Craig Essing" methamphetamine, when in fact Agent Young testified A.R. only identified the person as "Craig" who goes by the nickname "Pops." Even if all information from A.R. were removed from the affidavit, however, sufficient information remains to support a finding of probable cause.

Doc. No. 66 at 16-17. Similarly, under the two-step *Franks* analysis, Judge Mahoney concluded:

Under the second *Franks* consideration, even if Agent Strouse had made a material misrepresentation or omission, Essing fails to show that Agent Strouse acted improperly. There is absolutely no indication that Agent Strouse intentionally omitted or misrepresented information in the affidavit. Even if omitted or misrepresented information were material to the probable cause finding, that fact does not demonstrate the affiant acted intentionally or with reckless disregard for the truth. *Finley*, 612 F.3d at 1002. In determining whether an agent acted intentionally or with reckless disregard, the court should consider "whether, viewing all of the evidence, the affiant must have entertained serious doubts as to the truth of his statements, or had obvious reasons to doubt the accuracy of the information he reported." *Id.* (quoting *United States v. Clapp*, 46 F.3d 795, 801 n.6 (8th Cir. 1985)). As noted above, Agent Strouse carefully worded the affidavit to reflect the limitations of his observations and provided detailed information about CS#1. Essing has failed to meet his burden showing that Agent Strouse made a false statement or material omission either intentionally or with reckless disregard for the truth.

Doc. No. 66 at 15.

I agree. Strouse should have clarified that A.R. did not identify Craig Essing specifically, but "Craig." Regardless, I agree with Judge Mahoney that none of the evidence suggests that Strouse made this error with intention or with reckless disregard for the truth. It appears to be more of an omission of negligence or mistake. *See Franks*, 438 U.S. at 171 (stating "[a]llegations of negligence or innocent mistake are insufficient" to warrant a *Franks* hearing). Moreover, the absence of all information from A.R. does

not result in a finding of no probable cause. Therefore, Essing is not entitled to a *Franks* hearing under either step of the *Franks* analysis. His objections related to the denial of a *Franks* hearing are denied.

### 2.    *Probable Cause*

Essing objects to a finding of probable cause for issuance of the search warrant based on three separate arguments:

a.    None of the informants specifically identified defendant as the person receiving methamphetamine in Fort Dodge

b.    The affidavit did not include any statements regarding the reliability of M.L.A. or A.R.

c.    The information in the affidavit was stale

*See* Doc. No. 71 at 10. Probable cause is a "practical, nontechnical conception." *Illinois v. Gates*, 462 U.S. 213, 231 (1983) (citing *Brinegar v. United States*, 338 U.S. 160 (1949)). Stated another way, probable cause is a "fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232. The magistrate judge is tasked with making a "practical common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence will be found in a particular place." *Id.* at 238.

Judge Mahoney found the affidavit (even with the omissions raised by Essing) supported a finding of probable cause. *See* Doc. No. 66 at 15-16. She summarized the evidence concerning CS#1's statements about M.D.'s involvement in drug activity and predications about M.D.'s trip to Fort Dodge along with the prior information from M.L.A. and A.R. that led agents to believe Essing was involved with an ongoing drug trafficking operation. *Id.* at 16.

Essing's arguments relate to the information provided by M.L.A. and A.R. With regard to the reliability of the information, Judge Mahoney noted that M.L.A. implicated himself in the drug-trafficking activity and provided innocent details that agents could corroborate (older white male, lived on the south side of Fort Dodge, previously worked in a hospital-type setting). *Id.* She concluded a judge could find M.L.A. credible based on this information. *Id.* With regard to A.R., aside from the issue of "Craig" versus "Craig Essing," Judge Mahoney concluded his information also included indicia of reliability. For instance, A.R. was cooperating and implicated himself in drug-trafficking activity. A.R. also noted the person to whom he sold methamphetamine went by the nickname "Pops." *Id.* Even if A.R.'s information was excised from the affidavit, Judge Mahoney concluded the remaining information would support a finding of probable cause. *Id.* at 17.

I agree with this analysis regarding the reliability of the information supplied by M.L.A. and A.R. "When an affidavit in support of a search warrant is based upon information from an informant, the informant's 'reliability, veracity, and basis of knowledge are relevant considerations – but not independent, essential elements – in finding probable cause.'" *United States v. Faulkner*, 826 F.3d 1139, 1144 (8th Cir. 2016) (quoting *United States v. Reivich*, 793 F.2d 957, 959 (8th Cir. 1986)). Several factors may support the reliability of information such as in-person tips, a track record of providing trustworthy information and independent corroboration (especially of innocuous facts). *Id.* at 1145. Judge Mahoney identified several of these factors in the information provided by M.L.A. and A.R. I agree that it was reasonable for a judge to conclude that the information provided by these named informants was reliable. The fact that neither of them identified Craig Essing by name also does not affect the analysis as officers were able to use and corroborate the other identifying information they provided to lead them to Craig Essing.

With regard to Essing's staleness argument, the information from M.L.A. was provided on November 14, 2016, and the information from A.R. was provided on July

30, 2015. *See* Doc. No. 60 at 9-10. Essing relies on the arguments he made at the hearing regarding why the information in the affidavit is stale. He adds that Young stated he could not testify as to the likelihood that the drugs would be found at Essing's residence at the time the search warrant was executed. Doc. No. 71 at 10-11.

> Judge Mahoney reasoned:

> Agent Strouse described ongoing drug-trafficking activity in the affidavit, and in particular information about M.D. meeting with a person believed to be Essing on July 31st. The information from CS#1 on September 6th demonstrated that Essing would likely be involved in future activity (both the distribution of drugs and the collection of drug proceeds). Agent Strouse provided numerous statements based on his training and experience that persons involved in drug trafficking often maintain various forms of evidence and tools of the trade (including drug ledgers, contact information, financial records, cellular telephones, firearms, photographs, and surveillance equipment) at their residences and in their vehicles. *See* Ex. 1 at 3-8. These types of items are likely to be maintained for longer periods of time than actual drugs, and the judge could properly find that such evidence would likely be found at Essing's residence, in his white Ford Ranger, and on his person one week after the meeting with M.D. in Fort Dodge. In addition, the judge could reasonably infer that at least a portion of the nine pounds of methamphetamine that M.D. purportedly provided to Essing on or near August 31st would still be found at his residence or in the white Ford Ranger approximately one week later. This inference is supported by Agent Young's testimony during the suppression hearing. It was also possible (although less likely) that Essing would still be in possession of a record from drug transactions with M.L.A. that occurred in 2016 and with A.R. in 2015. The information from A.R. and M.L.A. support a finding that Essing was engaged in ongoing drug-trafficking activity and corroborated the information from CS#1. The affidavit provided sufficient information to support the judge's finding that the items listed would be found on Essing's person, at his residence, and in his white Ford Ranger.

Doc. No. 66 at 18 (citation omitted). I agree with Judge Mahoney's analysis. The information provided by M.L.A. and A.R. was used to corroborate CS#1's information and vice versa. Moreover, both M.L.A. and A.R. described multiple transactions, suggesting that Essing had been involved in drug trafficking in the past and would

continue in the future. Because the information in the affidavit as a whole supported ongoing drug activity since at least 2015, the information is not stale. *See United States v. Johnson*, 848 F.3d 872, 877 (8th Cir. 2017) ("A 'lapse of time is least important when the suspected criminal activity is continuing in nature and when the property is not likely to be destroyed or dissipated.'"); *United States v. Davis*, 867 F.3d 1021, 1028 (8th Cir. 2017) (information in warrant was not stale when detailing that officers had reason to believe that defendant had continually sold methamphetamine for over a year with most recent drug-related activity taking places 10 days prior to issuance of warrant). While the information does not necessarily establish the probability that certain evidence would be found at Essing's residence (namely drugs from older transactions), Strouse discussed other types of evidence (documents containing contact information of associates, records of transactions, cash, receipts, photographs) that drug traffickers often keep at their residence. *See* Doc. No. 60 at 4-5. For these reasons, the information from M.L.A. and A.R. was not stale. This objection is overruled.

Based on the totality of the circumstances, I agree with Judge Mahoney that the warrant was supported by probable cause even in the absence of the challenged information.

### 3.     *Good Faith Exception*

Finally, Essing objects to Judge Mahoney's finding that even if the warrant was not supported by probable cause, the officers relied on it in good faith under *United States v. Leon*, 468 U.S. 897 (1984). Specifically, Essing argues that I should not examine good faith from the perspective of the officers executing the warrant, but from Strouse's perspective.

Judge Mahoney stated:

> Because I do not find that the affidavit was misleading or that Agent Strouse acted intentionally or recklessly in providing information to the judge, the good faith exception should apply. *See id.* Agent Strouse appears to have carefully written the affidavit to make clear the limitations

of his observations and information. The affidavit was not so lacking in probable cause to render any reliance on the warrant by an officer entirely unreasonable. *See id.* at 670-72. Indeed, Agent Young believed it was highly likely that agents would find evidence of drug distribution (in addition to methamphetamine) during the search, and he believed the warrant was based on probable cause. This is supported by the affidavit's information of Essing's alleged involvement in drug trafficking activities since 2015. Officers may rely in good faith on a warrant to search a location connected to a defendant when an affiant describes the defendant's "continuous course of drug trafficking activity" and states that based on the affiant's training and experience, the warrant will likely lead to evidence of drug trafficking. *United States v. Ross*, 487 F.3d 1120, 1123-24 (8th Cir. 2007) (finding officer reasonably relied on warrant to search defendant's residence when no information connected residence to drug trafficking, but an informant provided information that a load of marijuana in a controlled delivery was destined for defendant).

The remaining exceptions to the good faith exception do not appear to apply in this case. Therefore, even if the affidavit lacked sufficient probable cause to issue the warrant (which I do not believe is the case), the agents relied in good faith on the issuing judge's determination of probable cause and issuance of the search warrant.

Doc. No. 66 at 18-19.

"Under the *Leon* good-faith exception, disputed evidence will be admitted if it was objectively reasonable for the officer executing a search warrant to have relied in good faith on the judge's determination that there was probable cause to issue the warrant." *United States v. Grant*, 490 F.3d 627, 632 (8th Cir. 2007) (citing *Leon*, 468 U.S. at 922). By arguing that I should consider only Strouse's perspective in evaluating the applicability of this exception, Essing argues that *Leon* should not apply because Strouse was either dishonest or reckless in preparing the affidavit or did not have an objectively reasonable belief that there was probable cause. *See Leon*, 468 U.S. at 926. For the same reasons discussed above, I find the evidence fails to demonstrate that the affidavit contains falsehoods or omissions made with intention or reckless disregard for the truth. Thus, this exception to the *Leon* good faith rule does not apply. Based on my de novo review

of the evidence, I agree with Judge Mahoney that even if the affidavit did lack probable cause, the officers relied in good faith on the judge's determination of probable cause and issuance of the search warrant. This objection is overruled.

### IV. CONCLUSION

For the reasons set forth herein:

1.     I **accept** Judge Mahoney's Report and Recommendation (Doc. No. 66) without modification.

2.     Pursuant to Judge Mahoney's recommendation, defendant's motion (Doc. No. 56) to suppress and request for *Franks* hearing is **denied**.

**IT IS SO ORDERED.**

**DATED** this 22nd day of October, 2018.

_____
Leonard T. Strand, Chief Judge